2024R00017/SAA/JM

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton, U.S.D.J. |
| | : | |
| v. | : | Crim. No. 26- |
| | : | |
| FRANK INCOGNITO | : | 18 U.S.C. § 371 |
| | : | |

# **I N F O R M A T I O N**

The defendant having waived in open court prosecution by Indictment, the United States charges:

## **THE FEDERAL FOOD, DRUG, AND COSMETIC ACT**

1.     The United States Food and Drug Administration ("FDA") is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-399i (the "FDCA").

2.     The FDCA defines a "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," "articles . . . intended to affect the structure or any function of the body of man," and articles intended for use as components of other drugs.  21 U.S.C. § 321(g)(1)(B), (C) and (D).

3.     Under the FDCA, "prescription drugs" are drugs that, because of their toxicity and other potential for harmful effects, and/or the collateral measures necessary to their use, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(1)(A). A drug is also a prescription drug if the FDA requires it to be administered under the supervision of a practitioner licensed by law to administer such drug as a condition of the FDA's approval of the drug.  21 U.S.C. § 353(b)(l)(B).

4.      The FDCA prohibits "the sale, purchase, or trade of a drug or drug sample or the offer to sell, purchase, or trade a drug or drug sample in violation of section 353(c) of this title," which includes prescription drugs which were purchased by "a public or private hospital or other health care entity."  21 U.S.C. §§ 331(t) & 353(c)(3)(A).

5.      21 U.S.C. § 353(c)(3)(A) provides, in relevant part, that "[n]o person may sell, purchase, or trade, or offer to sell, purchase, or trade, any drug (i) which is subject to subsection (b), and (ii)(I) which was purchased by a public or private hospital or other health care entity."

6.      A "health care entity" is defined as: "[A]ny person that provides diagnostic, medical, surgical, or dental treatment, or chronic or rehabilitative care, but does not include any retail pharmacy or any wholesale distributor.  Except as provided in § 203.22(h) and (i), a person cannot simultaneously be a 'health care entity' and a retail pharmacy or wholesale distributor."  21 C.F.R. 203.3(q).

7.      At all times relevant to this Information:

a.      Herceptin® was an FDA-approved drug manufactured by Drug Manufacturer 1.  It contained the active ingredient trastuzumab.  Herceptin® was indicated for treatment of patients with metastatic breast cancer, adjuvant breast cancer, and metastatic gastric cancer.

b.      Rituxan® was an FDA-approved drug manufactured by Drug Manufacturer 1.  It contained the active ingredient rituximab. Rituxan® was indicated for several treatments, including, among others, treatment of adult patients with non-Hodgkin's lymphoma and chronic lymphocytic leukemia, and pediatric patients aged 6 months or older with mature B-cell non-Hodgkins's lymphoma and mature B-cell acute leukemia.

c.      Kadcyla® was an FDA-approved drug manufactured by Drug Manufacturer 1. It contained the active ingredient trastuzumab emtansine. Kadcyla® was indicated for the treatment of HER2-positive breast cancer.

d.      Lucentis® was an FDA-approved drug manufactured by Drug Manufacturer 1. It contained the active ingredient ranibizumab. Lucentis® was indicated for several treatments, including wet age-related macular degeneration, diabetic retinopathy, diabetic macular edema, and myopic choroidal neovascularization.

e.      Herceptin®, Rituxan®, Kadcyla® and Lucentis® were each a "drug" under the FDCA because each was intended for use in the treatment of disease in man. 21 U.S.C. § 321(g)(1)(B). In addition, Herceptin®, Rituxan®, Kadcyla® and Lucentis® were each a "prescription drug" within the meaning of 21 U.S.C. § 353(b)(l)(A) and (B). Herceptin®, Rituxan®, Kadcyla® and Lucentis® were also each a "biological product." The term "biological product" includes a wide range of products, such as viruses, toxins, vaccines, blood, proteins and other specific similar substances "applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). Biological products are produced from a variety of natural sources—human, animal, or microorganism.

8.      Many products listed above met the definition of both "drug" and "biological product." Pursuant to 42 U.S.C. § 262(j), the FDCA applies to biological products subject to regulation under Title 42.

9.      Most biological products require specific storage conditions including protection from exposure to light and heat, as indicated in the product labeling, to maintain their safety, purity, and potency. Typically, such products are referred to as "cold chain" products, meaning that they must be refrigerated within a narrow cold-temperature range at all times—from the time the products are manufactured until the time that the products are administered to a patient. If the

3

biological products are not kept under the proper conditions, they quickly will degrade, though the degradation may not be visibly discernable. Accordingly, manufacturers of biological products, as well as their licensed authorized distributors, tightly control the sale and distribution of such products.

10.    Also, at all times relevant to this Information, to ensure and maintain the safety and efficacy of Herceptin®, Rituxan®, Kadcyla® and Lucentis®, Manufacturer 1 provided that Herceptin®, Rituxan®, Kadcyla® and Lucentis® should be stored and handled so as to avoid exposure to light and heat, proscribing a narrow temperature range within which these cold chain drugs must be maintained. In general, Manufacturer 1 also limited distribution of Herceptin®, Rituxan®, Kadcyla® and Lucentis® to authorized pharmaceutical distributors who, in turn, were permitted only to sell to authorized purchasers.

## RELEVANT INDIVIDUALS AND ENTITIES

11.    At all times relevant to this Information:

a.    Defendant FRANK INCOGNITO was employed as the Operations Manager for VRC Medical Services and Investigational Drug Delivery (collectively referred to herein as "VRC/IDD"), both of which were New Jersey corporations that were "wholesale distributors" engaged in the "wholesale distribution" of prescription drugs, as defined in 21 C.F.R. § 203.3(cc), (dd). VRC/IDD operated out of offices located in Sewaren, New Jersey, and was owned, operated, and/or controlled by defendant FRANK INCOGNITO as the Operations Manager and also Individual 1, Individual 2, and Individual 4 (collectively, "Individuals 1, 2 and 4") who are not named as defendants herein.

b.    Defendant FRANK INCOGNITO and Individuals 1, 2 and 4 also owned, operated and/or controlled additional New Jersey corporations, hereinafter referred to collectively

4

as Businesses 3-6, which were related to VRC/IDD and which also engaged in transactions involving expensive prescription drugs, including the biologic products described herein.

c.      Jon Paul Dadaian, MD ("Dr. Dadaian"), who is named as a co-conspirator but not as a defendant herein and charged elsewhere, was a physician licensed by the state of New Jersey to practice medicine, and he was also registered with the Drug Enforcement Administration ("DEA") to dispense controlled substances.

d.      Dr. Dadaian was a board-certified anesthesiologist and pain management specialist who practiced medicine through his professional corporation and medical practice, Jon Paul Dadaian PC. Jon Paul Dadaian PC had offices at several locations in New Jersey, including an office in Elmwood Park, New Jersey.

e.      Through his medical practice, Jon Paul Dadaian PC, Dr. Dadaian provided diagnostic and medical treatment to patients.  Both Dr. Dadaian and Jon Paul Dadaian PC were "health care entities" as that term is defined in 21 C.F.R. § 203.3(q).

f.      Joel Lerner, MD ("Dr. Lerner"), who is named as a co-conspirator but not as a defendant herein and charged elsewhere, was a physician licensed by the state of New Jersey to practice medicine, and he was also registered with the Drug Enforcement Administration ("DEA") to dispense controlled substances.

g.      Dr. Lerner was a board-certified podiatrist who practiced medicine together with several other podiatrists through their collectively owned limited liability corporation and medical practice referred to herein as "Dr. Lerner's Medical Practice."  Dr. Lerner's Medical Practice had offices at several locations in New Jersey, including offices in Union and Springfield, New Jersey.

h.      Through Dr. Lerner's Medical Practice, Dr. Lerner provided diagnostic and medical treatment to patients.  Both Dr. Lerner and Dr. Lerner's Medical Practice were "health care entities" as that term is defined in 21 C.F.R. 203.3(q).

i.      In addition to his medical practice, Dr. Lerner, together with another health care professional, operated and controlled a medical purchasing group referred to herein as "Medical Purchasing Group," which bought certain medical supplies in bulk in order to pass on discounts to other physicians/practices who were members of Medical Purchasing Group. At no time, however, did Medical Purchasing Group actually buy or sell the prescription drugs at issue in this Information, *i.e.*, drugs used to treat cancers, macular degeneration, and autoimmune diseases, including but not limited to Herceptin®, Rituxan®, Kadcyla® and Lucentis®. Rather, as explained below, Dr. Lerner and others merely created the appearance that Medical Purchasing Group was the actual purchaser of the prescription drugs, in order to further their scheme.

j.      Anise Kachadourian, MD ("Dr. Kachadourian"), who is named as a co-conspirator but not as a defendant herein and charged elsewhere, was a physician licensed by the state of New Jersey to practice medicine, and she was also registered with the Drug Enforcement Administration ("DEA") to dispense controlled substances.

k.      Dr. Kachadourian was a board-certified oncologist who practiced medicine through her professional corporation and medical practice, Anise Kachadourian MD LLC.  Anise Kachadourian MD LLC had offices at several locations in New Jersey, including an office in Union, New Jersey.

l.      Through her medical practice, Anise Kachadourian MD LLC, Dr. Kachadourian provided diagnostic and medical treatment to patients.  Both Dr. Kachadourian and Anise Kachadourian MD LLC were "health care entities" as that term is defined in 21 C.F.R. § 203.3(q).

6

**THE CONSPIRACY**

12.     From at least as early as in or about June 2012 through in or about January 2019, in the District of New Jersey and elsewhere, defendant

**FRANK INCOGNITO**

knowingly and willfully conspired and agreed with Individual 1, Individual 2, Dr. Dadaian, Dr. Lerner, Dr. Kachadourian and others, as set forth in more detail below, to engage in the resale of prescription drugs previously purchased by a health care entity with the intent to defraud and mislead, contrary to Title 21, United States Code, Sections 353(c)(3)(A), 331(t) and 333(a)(2).

**GOAL OF THE CONSPIRACY**

13.     It was the goal of the conspiracy to unlawfully divert prescription drugs from the ordinary and authorized pharmaceutical distribution chain by fraud and deception, and then to resell such drugs illegally for profit.

**MANNER AND MEANS OF THE CONSPIRACY**

14.     Individuals 1 and 2 recruited and used Dr. Dadaian, Dr. Lerner and Dr. Kachadourian, and their respective medical practices, Jon Paul Dadaian PC, Dr. Lerner's Medical Practice, and Anise Kachadourian MD LLC, to purchase expensive prescription drugs—primarily, cold-chain biologic infusion medications that typically were used to treat cancers, macular degeneration, and  autoimmune diseases, including but not limited to Herceptin®, Rituxan®, Kadcyla® and Lucentis®—under false pretenses so that Individuals 1 and 2 and defendant FRANK INCOGNITO could resell these prescription drugs at a profit through VRC/IDD.

15.     By recruiting and using Dr. Dadaian, Dr. Lerner and Dr. Kachadourian to serve as straw purchasers of the drugs, Individuals 1 and 2 and defendant FRANK INCOGNITO were able to obtain prescription drugs from the pharmaceutical manufacturers' authorized distributors that they would not otherwise have been permitted to purchase, which they were then able to resell at

7

a profit through VRC/IDD. In addition, by falsely making it appear that the physician coconspirators were the actual purchasers of the drugs, Individuals 1 and 2 and defendant FRANK INCOGNITO were able to purchase some of the drugs at discounts to which they were not otherwise entitled.  The discounts were reserved for physicians who were treating their own patients.

16.    During the following time periods, each of the below listed physicians misused their medical licenses and allowed others, including Individuals 1 and 2 and defendant FRANK INCOGNITO, to misuse their medical licenses to purchase millions of dollars of prescription drugs outside the ordinary and authorized pharmaceutical distribution chain.

a.    Dr. Dadaian – purchased more than $40 million in prescription drugs during the period from in or about June 2012 through in or about April 2018;

b.    Dr. Lerner – purchased more than $1.2 million in prescription drugs during the period from in or about December 2014 through in or about November 2018; and

c.    Dr. Kachadourian – purchased more than $6.5 million in prescription drugs during the period from in or about October 2016 through in or about January 2019. These prescription drugs were diverted from the normal pharmaceutical distribution supply chain and subsequently distributed in unauthorized transactions, including further transfers and resale to other customers, as described herein.

17.    In making such purchases, Individuals 1 and 2, defendant FRANK INCOGNITO, VRC/IDD and Dr. Dadaian, Dr. Lerner and Dr. Kachadourian made, and caused to be made, numerous false and misleading statements to the pharmaceutical manufacturers and their authorized distributors. These false and misleading statements included, but were not limited to, the following:

8

a.    Dr. Dadaian, Dr. Lerner and Dr. Kachadourian and/or their medical practices were the actual purchasers of the prescription drugs;

b.    Dr. Dadaian, Dr. Lerner and Dr. Kachadourian and their medical practices used such prescription drugs to treat patients through their medical practices and/or at a non-existent infusion clinic, which was discussed by some of the conspirators, but which was never actually formed or operated; and

c.    The prescription drugs were not being resold or redistributed.

18.    None of the prescription drugs purchased by Dr. Dadaian, Dr. Lerner and Dr. Kachadourian, and/or the names of their medical practices, or by defendant FRANK INCOGNITO and Individuals 1 and 2, using the physicians' medical licenses, were actually administered or intended to be administered to treat the physicians' own patients, as required by the applicable contract terms with the pharmaceutical manufacturers and distributors.

19.    Rather, all of the prescription drugs purchased in Dr. Dadaian's, Dr. Lerner's and Dr. Kachadourian's names, and/or the names of their medical practices, were sold and/or transferred to VRC/IDD.  The physicians and/or their medical practices purchased these drugs on their own and then illegally sold and/or transferred them to VRC/IDD, and they also allowed others, including defendant FRANK INCOGNITO and Individuals 1 and 2, to purchase the drugs in the physicians' names and/or their medical practices, and then sell and/or transfer those drugs to VRC/IDD.

20.    In exchange for allowing defendant FRANK INCOGNITO, Individuals 1 and 2 and VRC/IDD to use Dr. Dadaian, Dr. Lerner and Dr. Kachadourian and their medical practices to purchase prescription drugs, the physicians were compensated as follows:

a.    Dr. Dadaian was paid approximately $249,000;

9

b.      Dr. Lerner was paid approximately $24,000, and also received approximately $12,000 in discounts on various medical supplies that Dr. Lerner's Medical Purchasing Group purchased from Individual 1's Business 6; and

c.      Dr. Kachadourian was paid approximately $170,000.

21.    The coconspirators made efforts to obscure the fact that the physicians were serving as straw purchasers for VRC/IDD, including by taking steps to affirmative mislead the pharmaceutical manufacturers and their authorized distributors as to the identity of the actual purchaser—*i.e.*, VRC/IDD—and the fact that the prescription drugs were being resold for profit. As part of these efforts, the vast majority of the prescription drugs purchased using Dr. Dadaian's, Dr. Lerner's and Dr. Kachadourian's medical licenses were shipped to the respective physicians' offices, including:

a.   Dr. Dadaian's office in Elmwood, New Jersey;

b.   Dr. Lerner's offices in Springfield and Union, New Jersey; and

c.   Dr. Kachadourian's office in Union, New Jersey.

A majority of the drugs were then transported to the offices of VRC/IDD in Sewaren, New Jersey at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2 and others at VRC/IDD. Some of these drugs delivered to Dr. Kachadourian's office were then redirected by Dr. Kachadourian, her office's staff, and/or a sign posted on Dr. Kachadourian's office door to Business 6, a business that was located in the same building as Dr. Kachadourian's office and that was owned, operated and/or controlled by Individual 1.

22.    After the prescription drugs arrived at the offices of VRC/IDD, defendant FRANK INCOGNITO, Individuals 1 and 2, and others at VRC/IDD directed and controlled the repackaging and redistribution of the prescription drugs to VRC/IDD's customers. Some of these customers were also entities engaged in the business of distributing prescription drugs, including retail

10

pharmacies and other wholesale distributors who could not themselves have purchased the prescription drugs directly from the manufacturers and authorized distributors.

23.    In addition, in an effort to further obscure the fact that Dr. Lerner acted as a straw purchaser of drugs for VRC/IDD, Individual 1 and Dr. Lerner agreed that Dr. Lerner would sell and transfer the prescription drugs to VRC/IDD from Dr. Lerner's Medical Purchasing Group, rather than from Dr. Lerner's Medical Practice (through which Dr. Lerner actually had purchased the drugs).

24.    As the Operations Manager of VRC/IDD, defendant FRANK INCOGNITO was involved on a daily basis in conducting purchases of the prescription drugs from the manufacturers and authorized distributors of the drugs, including by communicating purchase requests to others and actually ordering the drugs himself.  Defendant INCOGNITO conducted these purchases in various ways—including by phone, email and internet—and did so by unlawfully using the names and medical licenses of Dr. Dadaian, Dr. Lerner and Dr. Kachadourian.  Defendant INCOGNITO also arranged for the transportation and redistribution of the drugs that had been unlawfully purchased by VRC/IDD.

## OVERT ACTS OF THE CONSPIRACY

25.    On or about the dates listed below, defendant FRANK INCOGNITO and Individuals 1 and 2 purchased and caused to be purchased, via false and fraudulent statements, the below-listed prescription drugs in Dr. Dadaian's name and using his medical license in the following approximate amounts, and at the discounted community physician prices, to which Dr. Dadaian was not entitled. Those prescription drugs were not administered or dispensed by Dr. Dadaian to treat his patients, as had been represented to the authorized manufacturers and distributors of the drugs; rather, the prescription drugs were sold and/or transferred and caused to be sold and/or transferred from Dr. Dadaian and Jon Paul Dadaian PC to VRC/IDD by defendant

11

FRANK INCOGNITO and Individuals 1 and 2. In order to deceive the authorized pharmaceutical distributors as to the use of the prescription drugs, each of those prescription drugs was received by Dr. Dadaian and/or his office staff at his medical office in Elmwood Park, New Jersey and then transported, at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2, to VRC/IDD in Sewaren, New Jersey. After arriving at VRC/IDD, the prescription drugs were repackaged and sold to customers of VRC/IDD, at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2, and at a significant profit.

| DEFENDANT FRANK INCOGNITO AND INDIVIDUALS 1 AND 2 PURCHASED AND CAUSED TO BE PURCHASED DRUGS IN DR. DADAIAN'S NAME AND USING HIS MEDICAL LICENSE | | | RESALE AT A PROFIT BY VRC/IDD |
|---|---|---|---|
| DATE PURCHASED | PRODUCT & INVOICE NUMBER(S) | PURCHASE PRICE FROM AUTHORIZED DISTRIBUTOR | VRC/IDD INVOICE DATE, NUMBER, & SALES PRICE |
| 03/15/2016 | 444 Herceptin® 440 MG 20 ML (Inv. Nos. 312662103741, 312662103742) | $1,671,500.16 | 03/14/2016 $1,833,720.00 (Customer 1/Inv. No. Q1614MYO-1) |
| 3/16/2016 | 605 Rituxan® 10 MG/ML 50 ML SDV 1/EA (Inv. Nos. 0310499167175, 0310499167178 through 0310499167188) | $2,216,756.30 | 3/15/2016 $2,462,350.00 (Customer 1/Inv. No. Q1615MYO-1) |
| 11/29/2017 | 680 Herceptin® 150 MG SDV LYO PWD 1/EA (Inv. No. 313784626943 through 313784626945) | $953,543.60 | 11/28/2017 $1,088,000 (Customer 1/ Inv. No. L1728MYO-1) |

26.     On or about the dates listed below, defendant FRANK INCOGNITO and Individuals 1 and 2, purchased and caused to be purchased, via false and fraudulent statements, the below-listed prescription drugs in the following approximate amounts in the name of Dr. Lerner's Medical Practice and using Dr. Lerner's medical license. To deceive the authorized pharmaceutical distributors as to the use of the prescription drugs, each of those prescription drugs was received by Dr. Lerner and/or his office staff at his medical office in Springfield, New Jersey

and then transported, at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2, to VRC/IDD in Sewaren, New Jersey. The drugs were repackaged and sold to customers of VRC/IDD, at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2, at a profit, as indicated by the approximate amounts listed below. To further obscure the true purchaser of the drugs, Dr. Lerner provided false documentation to VRC/IDD which purported to transfer the drugs from Dr. Lerner's Medical Purchasing Group to VRC/IDD.

| DEFENDANT FRANK INCOGNITO AND INDIVIDUALS 1 AND 2 PURCHASED AND CAUSED TO BE PURCHASED DRUGS IN DR. LERNER'S NAME AND USING HIS MEDICAL LICENSE | | | RESALE AT A PROFIT BY VRC/IDD |
|---|---|---|---|
| DATE PURCHASED | PRODUCT & INVOICE NUMBER(S) | PURCHASE PRICE FROM AUTHORIZED DISTRIBUTOR | VRC/IDD INVOICE DATE, NUMBER, & SALES PRICE |
| 07/12/2018 | Kadcyla® 100 mg and Kadcyla® 160 mg (Inv. No. 315019058) | $7,768.60 | 07/17/2018 $11,625.00 (Customer 1/Inv. No. U1817MYO-1) |
| 09/19/2018 | Lucentis® 0.5 mg (10mg/ml) (Invoice No. 315451398) | $1,958.78 | 09/21/2018 $2,850 (Customer 2/Inv. No. W1821CCTS-1) |

27.    On or about the dates listed below, defendant FRANK INCOGNITO and Individuals 1 and 2 purchased and caused to be purchased, via false and fraudulent statements, the below-listed prescription drugs in Dr. Kachadourian's name and using her medical license in the following approximate amounts. Those prescription drugs were not administered or dispensed by Dr. Kachadourian to treat her patients, but rather were sold and/or transferred and caused to be sold and/or transferred from Dr. Kachadourian and Anise Kachadourian MD LLC to VRC/IDD by defendant FRANK INCOGNITO and Individuals 1 and 2. In order to deceive the authorized pharmaceutical distributors as to the use of the prescription drugs, each of those prescription drugs was received by Dr. Kachadourian and/or her office staff at her medical office in Union, New

Jersey and then transported, at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2, to VRC/IDD in Sewaren, New Jersey. After arriving at VRC/IDD, the prescription drugs were repackaged and sold to customers of VRC/IDD, at the direction of defendant FRANK INCOGNITO and Individuals 1 and 2, and at a significant profit.

| DEFENDANT FRANK INCOGNITO AND INDIVIDUALS 1 AND 2 PURCHASED AND CAUSED TO BE PURCHASED DRUGS IN DR. KACHADOURIAN'S NAME AND USING HER MEDICAL LICENSE | | | RESALE AT A PROFIT BY VRC/IDD |
|---|---|---|---|
| DATE PURCHASED | PRODUCT & INVOICE NUMBER(S) | PURCHASE PRICE FROM AUTHORIZED DISTRIBUTOR | VRC/IDD INVOICE DATE, NUMBER, & SALES PRICE |
| 4/30/2018 & 5/2/2018 | 550 Herceptin® 150 MG (2 orders of 275 units) (Inv. Nos. 11017587908 & 11017600014) | $832,166.50 | 5/1/2018 & 5/4/2018 $1,017,500 (Customer 1/Inv. Nos. S1801MYO-1 & S1804MYO-1) |
| 4/26/2018 | 168 Herceptin® 150 MG (Inv. No. 11017581039) | $254,189.04 | 4/27/2018 $336,000 (Customer 1/Inv. No. R1824MYO-PP) |
| 5/2/2018 | 14 Rituxan® 500 MG 50ML (Inv. No. 11017599330) | $63,273.92 | 4/26/2018 $70,000 (Customer 3/Inv. No. R1826ONE-PP) |

All in violation of Title 18, United States Code, Section 371.

TODD BLANCHE
United States Deputy Attorney General

PHILIP LAMPARELLO
Senior Counsel

*Joseph McFarlane*
JOSEPH MCFARLANE
SARA A. ALIABADI
Assistant United States Attorneys

Approved:

*/s/ R. David Walk, Jr.*
R. David Walk, Jr.
Deputy U.S. Attorney

14

2024R00017/SAA/JM

CASE NUMBER:  **26-**_____

United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

FRANK INCOGNITO

INFORMATION FOR

18 U.S.C. § 371

**TODD BLANCHE**
UNITED STATES DEPUTY ATTORNEY GENERAL
**PHILLIP LAMPARELLO**
SENIOR COUNSEL

SARA ALIABADI
JOSEPH MCFARLANE
ASSISTANT U.S. ATTORNEYS
CAMDEN, NEW JERSEY
856-757-5026